2020 IL App (1st) 172626-U

Nos. 1-17-2626, 1-18-0612 (cons.)

Fourth Division
November 25, 2020

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) | |
| | ) | Nos.   12 CR 17053 |
| v. | ) ) | 12 CR 17054 |
| WILLIE MORRISON, | ) ) | The Honorable Alfredo Maldonado, |
| Defendant-Appellant. | ) ) ) | Judge Presiding. |

_____

PRESIDING JUSTICE GORDON delivered the judgment of the court.
Justices Hall and Lampkin concurred in the judgment.

**ORDER**

¶ 1   *Held:*   The trial court's judgment in each of defendant's convictions is affirmed, where: (1) the indictments in both cases were not unreasonably broad, (2) any error in cross-examining defendant did not rise to the level of plain error, (3) the victims' aunt's reference to defendant as a "predator" in minor T.W.'s case did not constitute reversible error, and (4) the prosecutor's comments during opening and closing in minor D.W.'s case were not improper.

¶ 2   After a jury trial, defendant Willie Morrison was convicted of predatory criminal sexual assault of a child and aggravated criminal sexual abuse of minor T.W., for which he was sentenced to a total of 67 years with the Illinois Department of Corrections (IDOC). Following that conviction, and after another jury trial, defendant was convicted of predatory criminal sexual assault of minor D.W., T.W.'s sister, for which he was sentenced to three concurrent

terms of natural life, consecutive to the 67-year sentence he received in T.W.'s case. Defendant appeals his convictions in both cases, and we consolidated defendant's appeals of the two cases, as they involve similar facts and raise similar issues. In both cases, defendant contends that reversal is warranted (1) because the indictment alleged an unreasonably broad time period and (2) because, in each case, the prosecutor improperly asked defendant to comment on the veracity of the State's witnesses. In T.W.'s case, defendant also claims that the trial court erred in permitting a State's witness to refer to defendant as a "predator." Finally, in D.W.'s case, defendant claims that the State's comments in opening and closing were improper and required reversal. For the reasons set forth below, we affirm the trial court's judgment in both cases.

¶ 3                                   BACKGROUND

¶ 4                               I. Pretrial Proceedings

¶ 5        Defendant was originally charged with six counts of predatory criminal sexual assault of a child and three counts of aggravated criminal sexual abuse in case No. 12 CR 17053, for his alleged conduct with respect to three victims: sisters T.W., D.W., and A.W., all of whom were under 13 at the time that the alleged conduct occurred. The cases were later separated, and the ultimate charges defendant faced in each case were as follows. In case No. 12 CR 17053, defendant was charged with three counts of predatory criminal sexual assault of a child based on contact between defendant's penis and D.W.'s vagina and anus, and between defendant's mouth and D.W.'s vagina, all occurring when D.W. was under 13 years old. The contact was alleged to have occurred "on or about December 19, 2006 and continuing on through December 18, 2011." In case No. 12 CR 17054, defendant was charged with two counts of predatory criminal sexual assault of a child based on contact between defendant's penis and T.W.'s vagina and anus, and two counts of aggravated criminal sexual abuse based on defendant's

touching T.W.'s buttocks and breasts for the purpose of sexual gratification, all occurring when T.W. was under 13 years old. All of the contact was alleged to have occurred "on or about March 22, 2005 and continuing on through July 02, 2011." Finally, in case No. 12 CR 17055, defendant was charged with one count of predatory criminal sexual assault of a child based on contact between defendant's penis and A.W.'s anus, and one count of aggravated criminal sexual abuse based on defendant's touching A.W.'s buttocks for the purpose of sexual gratification, all occurring when A.W. was under 13 years old. Case no. 12 CR 17055 was later dismissed and is not at issue on appeal.

¶ 6     The State elected to proceed first on T.W.'s case, No. 12 CR 17054, and, on February 10, 2014, the State filed a motion *in limine* seeking to introduce certain statements made by T.W. under section 115-10 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-10 (West 2012)). The State's motion *in limine* was granted after a hearing, and defendant does not challenge the admission of this evidence on appeal.

¶ 7     On October 8, 2014, the State filed a motion *in limine* seeking to introduce evidence of other crimes in T.W.'s case under section 115-7.3 of the Code (725 ILCS 5/115-7.3 (West 2012)). Specifically, the State sought to introduce evidence of (1) acts allegedly committed by defendant against T.W.'s sisters, D.W. and A.W.; (2) a proposition defendant allegedly made to one of T.W.'s relatives; and (3) a prior sexual assault defendant allegedly committed against his biological daughter in 2001, for which he was acquitted after a jury trial. The State also filed a similar motion in D.W.'s case on the same day. After a hearing, the trial court denied the State's motion *in limine* with respect to using the evidence to show defendant's propensity to commit such acts, but permitted the evidence of defendant propositioning the relative to the extent that it explained the timing of T.W.'s outcry. The State filed a motion to reconsider and,

3

on February 27, 2017, the court granted the State's motion to reconsider in part, permitting the State to introduce evidence of defendant's alleged conduct toward T.W.'s sisters. Defendant does not challenge the court's order or the use of other-crimes evidence on appeal.

¶ 8                                              II. Trial

¶ 9        While defendant was separately tried and convicted for his conduct with respect to each victim, most of the same witnesses testified at each trial,[1] and defendant does not raise any issues with the sufficiency of the evidence at either trial, so we discuss the evidence presented at both trials together.

¶ 10       To the extent that specific portions of testimony or argument are required in order to consider defendant's arguments on appeal, we will quote such testimony or argument when we discuss that issue in our analysis below.

¶ 11       As noted, the State elected to proceed to trial first in T.W.'s case (case No. 12 CR 17054); the first trial ended in a mistrial due to a hung jury, but the State immediately retried defendant, with the second trial beginning on July 21, 2017. The jury in the second trial returned a guilty verdict on all four counts on July 25, 2017, and the trial court entered judgment on the verdict. Defendant filed a motion for a new trial, which was denied, and defendant was sentenced to 30 years for each of the predatory criminal sexual assault of a child charges, and 7 years for each of the aggravated criminal sexual abuse charges. The sentences for aggravated criminal sexual abuse were to be served concurrently, and the sentences for predatory criminal sexual assault of a child were to be served consecutively, for a total sentence of 67 years in the IDOC.

---

[1] The sole exception is an assistant State's Attorney (ASA) who testified at T.W.'s trial that he observed a forensic interview of T.W. and identified a video of the interview, which was then played for the jury.

4

¶ 12        In D.W.'s case (case No. 12 CR 17053), trial began on January 26, 2018. The jury returned a guilty verdict on all three counts of predatory criminal sexual assault of a child on January 30, 2018, and the trial court entered judgment on the verdict. Defendant filed a motion for a new trial, which was denied, and defendant was sentenced to natural life for each of the charges, to be served concurrently, but which were to be served consecutively to the sentence in T.W.'s case.

¶ 13                                        A. T.W.

¶ 14        T.W., who was 17 at the time of the trial in her case, testified that she had two sisters, D.W. and A.W., and a brother, K.M., who was defendant's son. T.W. testified that she was currently living with her grandmother, but that she previously lived with her mother and defendant, who she referred to as her stepfather. T.W. testified that the first time defendant engaged in inappropriate conduct, she was five years old. She was in her grandmother's bedroom, watching cartoons on television and eating a grilled cheese sandwich while her mother slept in another room, when defendant entered the bedroom, removed her clothing, applied Vaseline to her vagina, and placed his penis inside her vagina. After he was finished, he wiped her off, put her clothes back on, and left the room. T.W. did not tell anyone what had occurred because she did not understand what had happened.

¶ 15        T.W. testified that another time, she was excited about taking photos for her kindergarten graduation, and was upset when she discovered that her mother could not afford to purchase the photos. Defendant told her that he would pay for the photos if she would "do something," which T.W. did not understand. Defendant again removed her clothing, applied Vaseline to her vagina, and placed his penis inside her vagina. Defendant also gave her the money to purchase the photos.

5

¶ 16     T.W. testified that defendant continued with his conduct from the time she was 5 until she was 11 or 12 and that he typically touched her at night. T.W. testified that she shared a room with her sisters and sometimes a cousin, and would be asleep on the bed or on the floor. Defendant would enter the room quietly and wake her with a whisper or a tap, then remove her clothing. T.W. testified that, during these times, defendant's penis would touch her vagina and sometimes his hands would touch her breasts or buttocks.

¶ 17     T.W. testified that she lived in five or six different residences with her mother and defendant, and that defendant engaged in the same conduct in all of them. The frequency of defendant's conduct decreased at the last residence, which was where they were living when she was 11 or 12. T.W. testified that, in all of the residences she lived in, she shared a room with her sisters and sometimes a cousin. She never observed defendant engaging in any conduct with her sisters.

¶ 18     T.W. testified that defendant's conduct also occurred outside the home, such as in the van that he drove. T.W. testified that defendant's van had three rows, with blinds and tinted windows that made it difficult to see inside, and that he touched her 5 to 10 times inside the van. T.W. recalled one instance, when she was eight or nine, when she entered the van because defendant told her that they were going to the store to buy chips. After they were finished at the store, they returned to the van, which was parked on a side street, and defendant instructed her to go to the last row of the van, where he removed her clothing, applied Vaseline to her vagina, and placed his penis inside her vagina. A police vehicle drove by, so defendant became scared and moved to the driver's seat, but returned to the back when the police were gone. T.W. recalled this instance because she "would have thought the police would have caught on and would have been [suspicious] about the van," but they did not stop.

¶ 19    T.W. testified that, on approximately five occasions, defendant took her to his workplace at H&R Block. Once, when she was 9 or 10, he took her to his workplace and, after he was finished with his work, T.W., defendant, and defendant's friend left to obtain food, then returned to the office. T.W. sat in the back room eating and, when she went into the bathroom, defendant followed her; T.W. could not recall if the friend was still at the office. Defendant grabbed her from behind by the waist, pushed her towards the sink, removed her clothing, and inserted his penis into her vagina.

¶ 20    T.W. testified that, when she was 10 or 11, her grandfather died. She was at home with her sister, her cousin, and defendant when defendant asked for her phone. T.W. went to retrieve it, and defendant pulled her into his bedroom, where he pushed her onto the bed, removed her clothing, and placed his penis into her vagina. T.W. testified that she was able to remember this day specifically "[b]ecause it was the day I lost my grandfather."

¶ 21    T.W. testified that defendant's penis also touched her buttocks when she was 10 or 11. She was at the park with her siblings, and had returned to the van for something. Defendant followed her to the van, and instructed her to move to the backseat, against a window ledge. Defendant then told T.W. that she was "a big girl now" and inserted his penis into her anus. T.W. testified that he repeated this conduct on other occasions, but "not that many."

¶ 22    T.W. testified that, when she was 10, she was on a chair in her bedroom while her sister and cousin were sleeping in the bed. Defendant entered the room, pulled her to the floor, removed her clothing, and placed his penis into her vagina. T.W.'s sister began to move as though she was waking up, and defendant placed his hands around T.W.'s neck and said "if you say anything I will choke you to death." T.W. testified that this was the only time he threatened her.

¶ 23    T.W. testified that, during the years when defendant was touching her, she did not tell anyone because she was scared. However, in June 2012, she and her sisters took a summer trip to Iowa to visit her aunt and her cousins. One day, someone called her aunt, which led to her questioning T.W. and her sisters about defendant. T.W. did not say anything because she was still scared. Later, T.W. was sleeping, and her aunt woke her and again questioned her, "so it just burst out." T.W. was crying and felt a sense of relief "because it was like something that I was holding in for a long time." A few days later, her aunt took them back to Chicago, where she called the police. After she called the police, she took them to the Children's Advocacy Center, where T.W. spoke to a woman; T.W. testified that she was truthful with the woman "[b]ecause I wanted her to know the truth and to do something about it." After T.W. returned to Chicago, she and her siblings never lived with defendant or her mother again, and her grandmother became their legal guardian.

¶ 24                                  B. D.W.

¶ 25    D.W., who was 18 years old at the time of the trial in T.W.'s case and 19 at the time of her own, testified that she was the oldest of her siblings. D.W. testified that she was eight years old the first time that defendant touched her inappropriately. She was sleeping in her bedroom, when defendant came into the room, pulled her pants down, and inserted his penis into her vagina. D.W. was "shocked." On another occasion, defendant entered her room one night while she and a sibling were sleeping, and inserted his penis into her buttocks and into her vagina. Once, he tried to choke her to keep her quiet. D.W. testified that defendant once also touched his lips to her vagina when she was 10.

¶ 26    D.W. testified that they lived in a number of residences with her mother and defendant, and that defendant touched her inappropriately at each address, except for the last address.

D.W. testified that she shared a room with her siblings at each address. She never observed defendant abusing or threatening any of her sisters.

¶ 27   D.W. testified that in June 2012, she and her sisters traveled to Iowa to spend the summer with their aunt. While she was in Iowa, she told her aunt what defendant had done to her.

¶ 28                                C. A. W.

¶ 29   A.W., who was 15 years old at the time of the trial in T.W.'s case and 16 at the time of D.W.'s, testified that she lived with her grandmother and her siblings; A.W. was the youngest of the sisters. A.W. testified that defendant first touched her "in a bad way" when she was five years old, when he inserted his penis into her buttocks while she was in her bedroom sleeping. A.W. testified that defendant touched her inappropriately "more than ten times."

¶ 30                            D. Victims' Aunt

¶ 31   The victims' aunt testified that she lived in Des Moines, Iowa, and previously lived in Chicago with her mother and her sister. Her sister had four children: A.W., T.W., D.W., and K.M.; K.M. was defendant's son. When the victims' aunt lived in Chicago, defendant was also living at the same residence, and she thought of him as "a big brother that you never had."

¶ 32   In the summer of 2012, she traveled to Chicago to pick up A.W., T.W., and D.W., who were planning on spending the summer in Iowa with her daughter, who was similar to them in age. On July 7, 2012, she received a text message from one of her sisters, which led her to speak to the girls. She first spoke to D.W., then spoke to T.W. and A.W. at the same time. When she first spoke to T.W., T.W. denied that defendant had ever touched her inappropriately, but her aunt "[could] tell that she wasn't telling the truth" because of her demeanor. On July 10, her daughter approached her and told her that T.W. wanted to speak with her. The aunt found T.W. and A.W. in her daughter's room, crying. She asked what was wrong, and T.W.

9

told her that defendant had been touching T.W. on her "private parts," gesturing to her buttocks and her vagina. She asked T.W. where this would happen, and T.W. told her that defendant would take her to secluded areas, such as a Pizza Hut or a closed car wash. T.W. told her that defendant would trick her by telling her that they were going to her grandmother's house or to the store, and then pull over where he felt safe. T.W. informed her that she had not said anything earlier because she was scared and that defendant had threatened her.

¶ 33    After the conversation, the aunt began gathering money to pay for a trip back to Chicago; she had contacted the Des Moines police department but was told that they could not do anything. They returned to Chicago on July 23, 2012, and she took the girls straight to the police department; she was told to wait until the next day, so they stayed overnight at the home of her godsister. The next day, they contacted the police from the home of a relative and she took the girls to Comer Children's Hospital; a few days later, she brought them to the Children's Advocacy Center to be interviewed. The aunt eventually returned to Iowa and the girls stayed with their grandmother.

¶ 34                                    E. Sergeant Timothy Fenton

¶ 35    Sergeant Timothy Fenton testified that he was a patrol office on July 23, 2012, and received an assignment concerning a criminal sexual assault. He and his partner traveled to an address, where they met two of the victims' aunts; due to the victims' ages, they did not interview them directly. After speaking with the two adults, Fenton completed a police report and called the Department of Children and Family Services (DCFS), as it was a crime involving children, as well as a special investigations unit that specifically handled child sex crimes. The special investigations unit was located at the Children's Advocacy Center, which also contained offices for DCFS workers, health care professionals, and forensic interviewers; Fenton testified

10

that the Children's Advocacy Center was "just basically a setting where everybody is there to take care of the kids." DCFS advised Fenton to take the girls to the emergency room of a hospital, and Fenton brought them to Comer Children's Hospital.

¶ 36                                    F. Dr. Norell Rosado

¶ 37        Dr. Norell Rosado testified that he is a child abuse pediatrician who was working at the Children's Advocacy Center when the girls were brought in; Rosado testified as an expert in both pediatrics and in child abuse pediatrics with no objection. Rosado testified that, during his career, he had assessed "probably over 2,000 cases" for possible sexual abuse, and had given opinions of sexual abuse in approximately 10% of the cases.

¶ 38        Rosado testified that he was working at the Children's Advocacy Center on August 7, 2012, and examined T.W., D.W., and A.W. T.W. was 12 years old at the time, D.W. was 13, and A.W. was 10. The three children had been examined at the emergency room of a hospital, and had completed forensic interviews, so Rosado reviewed that information prior to his examination. Rosado did not feel the need to interview the girls further, but did perform another exam on each of them because he felt that the original exams had not been sufficient.

¶ 39        With respect to T.W., Rosado testified that T.W. had a very thin hymen, which became thinner "between the 6:00 and the 8:00 *** position." Rosado explained that this finding "is concerning for vaginal penetrating trauma." Rosado further explained that the area between "3:00" and "9:00" was the area that became most traumatized during sexual intercourse, which would cause thinning of the hymen in that area. Rosado also performed an exam of her anal cavity, which was normal. Rosado testified that this was not surprising, because while it was rare to observe vaginal findings of abuse, it was even more rare to observe anal findings, given the function of the organ and its ability to permit the passage of stool. Rosado opined that, to

a reasonable degree of medical certainty, T.W. was sexually abused, given the medical findings and her disclosure of vaginal and anal penetration. Rosado further testified that T.W.'s forensic interview was consistent with his findings and that he found it significant that she was able to recall details of what happened to her, such as locations and times, and the fact that the incidents were sometimes correlated with significant events, such as her grandfather dying. Rosado also found it significant that T.W. mentioned the use of lubrication, which was inappropriate knowledge for a child her age.

¶ 40　　With respect to D.W., Rosado testified that she also had findings that were concerning for vaginal penetrating trauma. Rosado testified that there were certain positions in the hymen in which some women naturally have "notches" or anatomical variances, but there were other positions in which it would not be normal to observe such notches. D.W. had two deep notches in the latter positions. As with T.W., D.W.'s anal exam was normal. Rosado opined that, to a reasonable degree of medical certainty, D.W. was sexually abused, given the medical findings and her disclosure of vaginal and anal penetration.

¶ 41　　Finally, with respect to A.W., Rosado noted that she had not provided any history of penis-to-vagina penetration but only penis-to-anus penetration. Her genital exam was normal, which Rosado found unsurprising.

¶ 42　　　　　　　　　　　　　　　G. Defendant

¶ 43　　Defendant took the stand on his own behalf, and testified that he met the victims' mother in 2004 and they moved in together in 2005. Defendant testified that he loved T.W., D.W., and A.W., and referred to them as his children; he further testified that they considered him to be a father figure to them. Defendant denied ever sexually assaulting any of them. Defendant recalled T.W.'s kindergarten photos, and that she wanted to purchase them, but testified that

12

he thought that T.W.'s grandparents purchased the photos. Defendant testified that he worked at H&R Block and that his workplace had a desk and a bathroom, but denied that he was ever alone there. Defendant testified that there were occasions when he took one of the girls on errands alone, including to work. Defendant also testified that he owned a van that had a third-row seat.

¶ 44                                                    ANALYSIS

¶ 45        As noted, defendant filed separate appeals from each conviction, and we consolidated defendant's appeals, as the two cases involve similar facts and raise similar issues. In both cases, defendant contends that reversal is warranted (1) because the indictment alleged an unreasonably broad time period and (2) because, in each case, the prosecutor improperly asked defendant to comment on the veracity of the State's witnesses. In T.W.'s case, defendant also claims that the trial court erred in permitting the victims' aunt to refer to defendant as a "predator." Finally, in D.W.'s case, defendant claims that the State's comments in opening and closing were improper and required reversal. We consider each of defendant's arguments in turn.

¶ 46                                                 I. Indictment

¶ 47        Defendant first claims that reversal is warranted because the State prosecuted defendant in each case under an indictment that alleged an unreasonably broad time period. A defendant has the fundamental right to be informed of the nature and cause of the criminal accusations made against him. U.S. Const., amend. VI; Ill. Const. 1970, art. I, § 8; *People v. Meyers*, 158 Ill. 2d 46, 51 (1994). This right is codified in section 111-3 of the Code of Criminal Procedure of 1963 (725 ILCS 5/111-3 (West 2012)), which is " 'designed to inform the accused of the nature of the offense with which he is charged so that he may prepare a defense and to assure

that the charged offense may serve as a bar to subsequent prosecution arising out of the same conduct.' " *Meyers*, 158 Ill. 2d at 51 (quoting *People v. Simmons*, 93 Ill. 2d 94, 99-100 (1982)).

¶ 48   When the sufficiency of the charging instrument is challenged in a pretrial motion, the standard of review is to determine whether the instrument strictly complies with the requirements of section 111-3. *People v. DiLorenzo*, 169 Ill. 2d 318, 321-22 (1996); *People v. Carey*, 2018 IL 121371, ¶ 21. However, where the sufficiency of the charging instrument is challenged for the first time on appeal, "the standard of review is more liberal." *DiLorenzo*, 169 Ill. 2d at 322. "In such a case, it is sufficient that the indictment apprised the accused of the precise offense charged with enough specificity to (1) allow the preparation of his defense and (2) allow pleading a resulting conviction as a bar to future prosecution arising out of the same conduct." *DiLorenzo*, 169 Ill. 2d at 322; *Carey*, 2018 IL 121371, ¶ 22. The sufficiency of a charging instrument is a question of law subject to *de novo* review. *Carey*, 2018 IL 121371, ¶ 19. *De novo* consideration means that a reviewing court preforms the same analysis that a trial judge would perform. *People v. Begay*, 2018 IL App (1st) 150446, ¶ 34.

¶ 49   In making this determination, the reviewing court may look to the record on appeal. *Carey*, 2018 IL 121371, ¶ 22. " 'Thus, the question is whether, in light of the facts of record, the indictment was so imprecise as to prejudice defendant's ability to prepare a defense.' " *Carey*, 2018 IL 121371, ¶ 22 (quoting *People v. Phillips*, 215 Ill. 2d 554, 562 (2005)). "If the reviewing court cannot say that the charging instrument error inhibited the defendant in the preparation of his or her defense, then the court cannot conclude that the defendant suffered any prejudice." *Carey*, 2018 IL 121371, ¶ 22.

¶ 50   In the case at bar, the indictments for T.W.'s and D.W.'s cases were similar. In case No. 12 CR 17053, defendant was charged with three counts of predatory criminal sexual assault of

a child based on contact between defendant's penis and D.W.'s vagina and anus, and between defendant's mouth and D.W.'s vagina, all occurring when D.W. was under 13 years old. The contact was alleged to have occurred "on or about December 19, 2006 and continuing on through December 18, 2011." In case No. 12 CR 17054, defendant was charged with two counts of predatory criminal sexual assault of a child based on contact between defendant's penis and T.W.'s vagina and anus, and two counts of aggravated criminal sexual abuse based on defendant's touching T.W.'s buttocks and breasts for the purpose of sexual gratification, all occurring when T.W. was under 13 years old. All of the contact was alleged to have occurred "on or about March 22, 2005 and continuing on through July 02, 2011." On appeal, defendant claims that these indictments failed to sufficiently set forth the specific time periods in which the alleged conduct occurred, thereby making it impossible for him to prepare a defense.

¶ 51    "The date of the offense is not an essential factor in child sex offense cases." *People v. Guerrero*, 356 Ill. App. 3d 22, 27 (2005). In cases involving the sexual abuse of a child, "flexibility is permitted" regarding the date requirement of section 111-3. *Guerrero*, 356 Ill. App. 3d at 27. "As long as the crime occurred within the statute of limitations and prior to the return of the charging instrument, the State need only provide the defendant with the best information it has as to when the offenses occurred." *Guerrero*, 356 Ill. App. 3d at 27.

¶ 52    In the case at bar, we cannot find that the time periods alleged in the indictments inhibited defendant in the preparation of his defense. We first note that defendant never sought to quash or dismiss the indictment, and never argued below that the indictment was insufficient. Additionally, each indictment provided defendant with notice of the charges against him, including the time period encompassed by the charges. Moreover, despite defendant's contention to the contrary, the State filed a bill of particulars in each case. While the bill of

15

particulars did not narrow the time frame for the charges, each did provide the locations of the alleged conduct, thereby providing additional detail. Defendant also does not contest that he was provided with copies of any police reports, forensic interviews, and medical examinations conducted in either case, all of which would have further provided information about specific incidents, especially where T.W. was able to connect incidents with events such as her kindergarten picture day and her grandfather's death. Given this information, and in light of the girls' young ages at the time the abuse began, we cannot find that the indictments inhibited defendant in his ability to prepare an adequate defense.

¶ 53      In reaching this conclusion, we find instructive the analysis set forth in *People v. Albarran*, 2018 IL App (1st) 151508. In that case, the defendant was indicted for multiple counts of criminal sexual assault, predatory criminal sexual assault of a child, aggravated criminal sexual abuse, and sexual relations within families, and the indictment alleged that the defendant committed the offenses between November 24, 2003, and November 24, 2008. *Albarran*, 2018 IL App (1st) 151508, ¶ 3. The defendant requested a bill of particulars, and the State responded that the incidents occurred " 'approximately six times' " within the five-year timespan. *Albarran*, 2018 IL App (1st) 151508, ¶ 5. The State also informed the trial court that it had provided the defendant with all of the discovery it had, including interviews with the victim and police reports, which listed dates and times of the alleged incidents. *Albarran*, 2018 IL App (1st) 151508, ¶ 5. On appeal, we found that "the indictment apprised defendant of the precise offenses charged with enough specificity to allow preparation of his defense," rejecting his arguments that the five-year timespan was overbroad. *Albarran*, 2018 IL App (1st) 151508, ¶ 23. We found:

"[W]e do not believe that under the circumstances of this case that the five-year time period alleged in each count of the indictment was so excessive as to be facially unreasonable. Here, the alleged abuse occurred while [the victim] was between the ages of 6 and 11 years old, and her age undoubtedly diminished her ability to recall the dates or times of the alleged abuse. She was, however, able to provide some general information regarding her age and the time of year when the abuse occurred. The State provided this evidence to defendant, and it constituted the most particularized evidence available. We agree with the circuit court's assessment that the State could not provide any more particularized information as to the dates of the abuse, and we conclude that the indictment was not so broad or vague as to impair defendant's constitutional right to prepare a defense, particularly where defendant identifies no prejudice to his ability to prepare a defense." *Albarran*, 2018 IL App (1st) 151508, ¶ 31.

¶ 54    Similarly, in the case at bar, both T.W. and D.W. were young when the alleged abuse occurred, with T.W.'s abuse beginning at age five and D.W.'s beginning at eight. Both were able to provide general information about their ages and the locations of the alleged abuse, with T.W. able to tie certain instances of abuse to specific events. The State provided this information to defendant, and there is no indication that any more particularized evidence was available. Consequently, we cannot find that the indictments impaired defendant's ability to prepare a defense. See also *Guerrero*, 356 Ill. App. 3d at 28-29 (finding dates in indictment sufficient where the victims were first abused when they were about six years old and the indictments and bill of particulars indicated that they were abused over a three-year time period).

17

¶ 55    We find unpersuasive defendant's reliance on the out-of-state case of *People v. Keindl*, 68 N.Y.2d 410 (N.Y. Ct. App. 1986), *superseded by statute*. The applicability of this case was considered and rejected by the *Albarran* court, and we reach the same conclusion here. First, as the *Albarran* court noted, both *Keindl* and *State v. Baker*, 411 S.C. 583 (2015), another case cited by defendant, are cases from foreign jurisdictions, and "we are not bound to follow the decisions of courts of last resort in our sister states, particularly where those decisions involve interpretation of those states' own constitutions and statutes." *Albarran*, 2018 IL App (1st) 151509, ¶ 24. Additionally, both cases involved pretrial motions to quash indictments, unlike the case at bar, and were decided based on the specific facts of those cases. *Albarran*, 2018 IL App (1st) 151509, ¶ 24. As noted, the procedural posture of the challenge determines the standard of review, so this difference alone renders defendant's cases inapplicable. Accordingly, we decline to apply defendant's out-of-state cases to invalidate the indictments at issue in the case at bar.

¶ 56    Defendant also argues that, in the alternative, trial counsel was ineffective in failing to challenge the indictment. Every defendant has a constitutional right to the effective assistance of counsel. U.S. Const. amend. VI; Ill. Const. 1970, art. I, § 8; *People v. Domagala*, 2013 IL 113688, ¶ 36. In order to determine whether a defendant was denied his or her right to effective assistance of counsel, a reviewing court must apply the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984). *People v. Colon*, 225 Ill. 2d 125, 135 (2007) (citing *People v. Albanese*, 104 Ill. 2d 504, 526 (1984) (adopting *Strickland*)). To prevail on a claim of ineffective assistance of counsel under *Strickland*, a defendant must prove both (1) that his or her attorney's actions constituted a deficiency so serious as to fall below an objective

standard of reasonableness and (2) that this deficient performance prejudiced defendant. *Domagala*, 2013 IL 113688, ¶ 36 (citing *Strickland*, 466 U.S. at 687).

¶ 57     To establish the first prong of the *Strickland* test, the defendant must show "that counsel's performance was objectively unreasonable under prevailing professional norms." *Domagala*, 2013 IL 113688, ¶ 36. To establish the second prong, that this deficient performance prejudiced the defendant, the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Domagala*, 2013 IL 113688, ¶ 36 (citing *Strickland*, 466 U.S. at 694). "[A] reasonable probability that the result would have been different is a probability sufficient to undermine confidence in the outcome—or put another way, that counsel's deficient performance rendered the result of the trial unreliable or fundamentally unfair." *People v. Evans*, 209 Ill. 2d 194, 220 (2004); *Colon*, 225 Ill. 2d at 135. A mistake in trial strategy or tactics, without more, does not amount to ineffective assistance of counsel. *People v. McGee*, 373 Ill. App. 3d 824, 835 (2007) (citing *People v. Ward*, 371 Ill. App. 3d 382, 434 (2007)). Counsel's trial strategy is " 'virtually unchallengeable.' " *McGee*, 373 Ill. App. 3d at 835 (quoting *People v. Palmer*, 162 Ill. 2d 465, 476 (1994)).

¶ 58     Since a defendant must satisfy both prongs of the *Strickland* test in order to prevail, a court may dispose of the claim if either prong is missing. *People v. Flores*, 153 Ill. 2d 264, 283 (1992). Thus, if a court finds that defendant was not prejudiced by the alleged error, it may dispose of the claim on that basis alone without further analysis. *People v. Graham*, 206 Ill. 2d 465, 476 (2003); *People v. Albanese*, 104 Ill. 2d 504, 527 (1984). The court does not need to consider the first prong of the *Strickland* test when the second prong cannot be satisfied. *People v. Lacy*, 407 Ill. App. 3d 442, 457 (2011) (citing *Graham*, 206 Ill. 2d at 476).

¶ 59    In the case at bar, we cannot find that trial counsel was ineffective for failing to challenge the indictments. First, we note that defendant claims that had counsel done so, the State could have been required to provide a bill of particulars. However, as noted, the State *did* provide a bill of particulars in each case. Additionally, we cannot find that defendant was prejudiced by the failure to challenge the indictments. While a challenge to the indictment would have required the State to narrow the indictment to the extent possible, there is no indication that it was even possible for the State to further refine the time period and, to the extent that the State could do so, defendant was already provided that information through the police reports, forensic interviews, and medical reports. Defendant was also able to provide a defense, which was based on his claims that there were so many people around at all times that it would have been impossible for him to have committed the conduct of which he was accused. While defendant claims that he could have offered other defenses had there been more specificity as to the dates, we cannot find that a challenge to the indictment would have altered his ability to present those defenses. Accordingly, we cannot find that defendant's trial counsel was ineffective in failing to challenge the indictments.

¶ 60                    II. Cross-Examination of Defendant

¶ 61    Next, defendant claims that, in each case, the prosecutor repeatedly asked defendant his opinion as to the veracity of the State's witnesses, warranting reversal. Defendant concedes that he did not properly preserve this issue for review in either case. To preserve a purported error for consideration by a reviewing court, a defendant must both (1) object to the error at trial and (2) raise the error in a posttrial motion. *People v. Sebby*, 2017 IL 119445, ¶ 48. "Failure to do either results in forfeiture." *Sebby*, 2017 IL 119445, ¶ 48.

¶ 62    However, the plain-error doctrine permits a reviewing court to consider an unpreserved claim (1) if a clear or obvious error occurred and the evidence is so closely balanced that this error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) if a clear or obvious error occurred and the error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence at defendant's trial. *Sebby*, 2017 IL 119445, ¶ 48; *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). Defendant asks us to consider his claim under both prongs.

¶ 63    In a plain-error analysis, it is the defendant who bears the burden of persuasion. *Sebby*, 2017 IL 119445, ¶ 51. The first step under either prong of the plain-error doctrine is to determine whether there was an error at trial and whether this error was clear or obvious. *Sebby*, 2017 IL 119445, ¶ 49; *Piatkowski*, 225 Ill. 2d at 565.

¶ 64    The proper scope of cross-examination is generally within the sound discretion of the trial court and is reviewed only for an abuse of discretion. *People v. Reese*, 2017 IL 120011, ¶ 75 ("A trial court's decisions on the admissibility of evidence and the scope of cross-examination *** are reviewed for abuse of discretion."); *People v. Collins*, 106 Ill. 2d 237, 269 (1985) ("[t]he latitude to be allowed on cross-examination and rebuttal" is "within the sound discretion of the trial court" and reviewed only for an "abuse of discretion"). However, it is improper to ask a criminal defendant to opine regarding the truthfulness of other witnesses, because such questions invade the jury's function of determining for itself the credibility of the witnesses. *People v. Tolbert*, 323 Ill. App. 3d 793, 807 (2001). While such questioning is improper, the prejudice resulting therefrom must be "substantial" to warrant reversal. *Tolbert*, 323 Ill. App. 3d at 807; *People v. Evans*, 373 Ill. App. 3d 948, 961 (2007).

¶ 65    In the case at bar, defendant claims that he was asked at both trials to opine as to the veracity of the witnesses. First, during cross-examination of defendant in T.W.'s case, the State questioned defendant about T.W.'s testimony:

"Q. Now, when you heard [T.W.] tell the ladies and gentlemen of the jury that she was alone in a van with you when you came in and raped her in that third row seat, you're telling the ladies and gentlemen of the jury here she lied?

A. Yes.

Q. And when [T.W.] took the stand and she told the ladies and gentlemen of the jury that when you took her into the bathroom and you raped her in the bathroom of the H&R Block, you're telling us that she lied?

A. Yeah.

Q. And when [T.W.] came on the stand and she said when you guys were in the van and you said you're a big girl now, she lied to these ladies and gentlemen of the jury; is that what you're telling us?

A. Yes.

Q. And you're telling us that when she came in and she told the ladies and gentlemen of the jury that you raped her over 20 times in all the different addresses, she was lying to these people?

A. Yep.

Q. And on this forensic interview five years ago when she told the forensic interviewer on tape five years ago that you would come into her room at night while she was sleeping, she lied, correct?

A. Correct.

22

Q. She lied again about the same incident, about the grandfather on the tape, you're telling the ladies and gentlemen of the jury that she lied, correct?

A. Correct.

Q. She lied five years ago and she lied today, correct?

A. Correct.

* * *

Q. When he died that day, everyone in the house was sad, you remember that day, correct?

A. Correct.

* * *

Q. And so out of all the days that were the saddest days as a family, when [T.W.] said that you raped her, that was a lie?

A. Correct."

¶ 66    Similarly, during cross-examination of defendant in D.W.'s case, the State questioned defendant about D.W.'s testimony:

"Q. Now, [defendant], you were in court here yesterday when [D.W.] got on the stand and said that she was 8 years old when you came into her bedroom. Do you remember that?

A. Yes, I was.

Q. And are you telling the ladies and gentlemen of the jury that when she told them that you choked her at 8 years old while she was sleeping, are you telling them she was lying?

23

A. Yep.

Q. And are you telling the ladies and gentlemen of the jury that when you whispered in her ear that, I will kill you if you tell anyone, are you telling these ladies and gentlemen of the jury that she was lying?

A. She was lying.

Q. Are you telling the ladies and gentlemen of the jury that when she said you raped her as a child when she was 8 years old, she was lying?

A. She was lying.

Q. Was she also lying when she said that you raped her when she was 9?

A. She was lying.

Q. Was she also lying when she said you raped her when she was 10, 11, and 12?

A. She was lying.

Q. When she told the ladies and gentlemen of the jury that you put your lips to her vagina, was that another lie?

A. Yes, it was.

Q. When she told the ladies and gentlemen of the jury that you put your penis in her anus and it hurt, are you telling them she was lying?

A. She was lying.

Q. Are you telling me that [T.W.] lied as well?

A. She did.

Q. Are you telling me that [A.W.] lied as well?

THE COURT: Counsel, move on.

24

Q. Everybody is a liar in this case; is that correct?

THE COURT: Counsel. Ask another question."

¶ 67    Based on the questioning of defendant, we agree that he was improperly asked to opine as to the veracity of the witnesses. See, *e.g.*, *People v. Riley*, 63 Ill. App. 3d 176, 185 (1978) (asking whether the defendant was asserting that the witnesses had told " 'a bunch of lies' " was improper); *People v. Graves*, 61 Ill. App. 3d 732, 747 (1978) (asking whether witnesses were " 'lying' " was improper); *People v. Hicks*, 133 Ill. App. 3d 424, 434 (1971) (asking whether witnesses had " 'lied' " was improper). However, we cannot find that this error rises to the level of plain error, under either prong.

¶ 68    Under the first prong, we cannot find that the evidence was closely balanced. Defendant contends that the verdict depended on the jury's determination of the believability of "two equally plausible versions of events." However, this understates the evidence presented in each trial. In each trial, all three sisters—T.W., D.W., and A.W.—testified that defendant had abused them on multiple occasions spanning several years. Their aunt also testified that the sisters reported this conduct to her during their visit to her home in Iowa. Additionally, Rosado performed medical examinations of all three girls and found that two of them had findings that were concerning for vaginal penetrating trauma. In each case, he also specifically opined, to a reasonable degree of medical certainty, that the victim in that case had been sexually abused. Defendant's testimony also corroborated certain aspects of the sisters' testimony, such as their descriptions of their living quarters, his ownership of a van with a third-row seat, and even that T.W. was excited about her kindergarten photos. Thus, we cannot find that the evidence in either case was closely balanced and cannot find plain error under the first prong of the plain-error analysis.

25

¶ 69    We also cannot find that the error rises to the level of plain error under the second prong. "Where the defendant claims second-prong plain error, a reviewing court must decide whether the defendant has shown that the error was so serious that it affected the fairness of the trial and challenged the integrity of the judicial process." *Sebby*, 2017 IL 119445, ¶ 87. Defendant claims that, in the case at bar, the State's questioning eroded the integrity of the proceedings by usurping the province of the jury. However, defendant cites no support for the proposition that the type of questioning that occurred here rises to the level of plain error under the second prong. In the sole case involving plain-error review he cites, the court reviewed the defendant's claims under the first, not second, prong. See *People v. Munoz*, 398 Ill. App. 3d 455, 487 (2010) (noting that "we have already found that the evidence in this case was closely balanced" and proceeding to review the defendant's claims for error). Moreover, in the case at bar, we cannot find that any error would be serious enough to fall under the second prong. Defendant's defense relied on the assumption that the girls were not telling the truth—the jury either needed to believe him or needed to believe them. Thus, while the State's questions may have been improper, they merely made explicit what was already the basis of his defense and did not affect the fairness of his trial. Accordingly, we cannot find that any error made by the State in its questioning of defendant rises to the level of plain error.

¶ 70    Alternatively, defendant also claims that trial counsel's failure to properly preserve the issue for review constituted ineffective assistance of counsel. As we have already set forth the two-prong test for such a claim, we need not repeat it here. However, we cannot find that counsel was ineffective in failing to preserve the issue because defendant was not prejudiced by any such failure. As noted, even if the State's questioning is improper, the prejudice resulting therefrom must be "substantial" to warrant reversal. *Tolbert*, 323 Ill. App. 3d at 807;

26

*Evans*, 373 Ill. App. 3d at 961. Here, we would not find substantial prejudice, for the same reasons as set forth in our plain-error analysis. Consequently, even if the issue had been properly preserved, it would have made no difference and, therefore, defendant's claim of ineffective assistance of counsel must fail. See *Graham*, 206 Ill. 2d at 476.

¶ 71                                III. Aunt's Testimony

¶ 72        Next, defendant claims that reversal is warranted where the trial court declined to strike the aunt's testimony in T.W.'s case that defendant was a "predator." On cross-examination in T.W.'s case, her aunt was asked about whether she observed defendant sexually assault anyone:

> "Q. When you were living with [defendant] and the whole family at those two addresses at anytime did you see [defendant] sexually assault anyone?
>
>                                     * * *
>
> A. No, I didn't. He is a predator. Did you hear her say he took her to secluded areas."

Defense counsel "ask[ed] all that be stricken from the record," and the court overruled the objection, stating that the "[a]nswer may stand."

¶ 73        The parties dispute whether defendant's claim concerning this comment was properly preserved. While defense counsel objected to the testimony at trial, defense counsel did not provide a basis for the objection. In his motion for a new trial, defendant raised as error that "[t]he court did not grant defendants [*sic*] request to strike a prejudicial and non-responsive answer to a question. [The aunt] testified that [defendant] was a 'predator,' and took [T.W.] to secluded areas. [Citation.] This testimony was both prejudicial and non-responsive and should have been stricken from the record."

¶ 74 Later, in the hearing on defendant's motion for a new trial, defense counsel again addressed the comment:

"She was nonresponsive—well, she—she had information that was nonresponsive to the question, including stating that [defendant] was a predator; and, Judge, and took [T.W.] to secluded areas. *** [W]e believe that, also, was extremely prejudicial and denied the Defendant a right to a fair trial."

In response, the court found:

"The third point regarding the objection that the defense made when they were cross examining [the aunt]. This was during cross examination. There was an objection. The question was non-responsive.

To my recollection, that question—the answer that came from it *** that [she] offered, wasn't entirely nonresponsive; and it was within the question and answer, which is why I did not sustain the defense's objection to non-responsive.

Moreover, even if that were the case, I don't believe that what [she] testified to in that instance, in any way was prejudicial and denied [defendant] a fair trial."

¶ 75 As noted, to preserve a purported error for consideration by a reviewing court, a defendant must both (1) object to the error at trial and (2) raise the error in a posttrial motion. *Sebby*, 2017 IL 119445, ¶ 48. A general objection raises only the question of relevance and results in the forfeiture of other issues. *People v. Villanueva*, 382 Ill. App. 3d 301, 304-05 (2008). In the case at bar, we cannot find that defense counsel's general objection to the aunt's testimony preserved a claim that her testimony was improper lay opinion testimony, as defendant contends on appeal. Indeed, the record shows that in the case at bar, the trial court was unaware

that defense counsel was raising any sort of issue about the prejudicial effect of her comment until the motion for new trial. Accordingly, we review defendant's claim only for plain error.

¶ 76    In the case at bar, we have no need to consider whether the aunt's comment was appropriate, because even if there was error, it would not rise to the level of plain error. Defendant's arguments about the first prong are the same arguments that he raised above about the closeness of the evidence. We have already explained that the evidence was not closely balanced, and we reach that same result here. As for the second prong, defendant contends that the comment usurped the province of the jury and undermined the reliability of the jury's credibility determination. We do not find this argument persuasive. The victims' aunt made a single allegedly improper comment throughout the entirety of her testimony, and this comment was brief and unrepeated. The jury heard the testimony of eight separate witnesses and viewed the video of T.W.'s forensic interview. There is no indication that this single comment had any effect whatsoever on the jury's ability to consider the evidence fairly. Consequently, even if there is any error, we cannot find that it rises to the level of plain error under either prong.

¶ 77    Defendant again makes the argument, in the alternative, that trial counsel was ineffective for failing to properly preserve the issue. However, we cannot find that there was any prejudice to defendant due to the brief and unrepeated nature of the comment and, therefore, we cannot find that trial counsel was ineffective in failing to preserve the issue. See *Graham*, 206 Ill. 2d at 476.

¶ 78                          IV. Improper Comments by State

¶ 79    Finally, defendant claims that, in D.W.'s case, the State made improper comments in its opening and in its rebuttal in closing, which he contends warrant reversal. Defendant concedes

that he did not preserve these issues for review, and asks us to review them under both prongs of the plain-error doctrine.

¶ 80    While the State has wide latitude in both its opening statements and closing arguments and may comment on the evidence, it is still improper for the State to make comments that have no other purpose than to arouse the prejudices and passions of the jury. *People v. Jones*, 2016 IL App (1st) 141008, ¶ 21; *People v. Herndon*, 2015 IL App (1st) 123375, ¶ 36 ("[i]t is improper for a prosecutor to make comments irrelevant to the question of guilt or innocence and that only serve to inflame the jury's passions"); *People v. Schneider*, 375 Ill. App. 3d 734, 755 (2007) ("the prosecutor's exhortations" to the jury to "have some compassion for the victim" were improper). However, even if the remarks were inappropriate, reversal is required only if they engendered such substantial prejudice against the defendant that it is impossible to tell whether the verdict of guilt resulted from them. *People v. Wheeler*, 226 Ill. 2d 92, 123; *People v. Johnson*, 119 Ill. 2d 119, 139-40; *Jones*, 2016 IL App (1st) 141008, ¶ 23. If the reviewing court cannot say whether the prosecutor's improper remarks contributed to the defendant's conviction, then it must grant a new trial. *Wheeler*, 226 Ill. 2d at 123; *Jones*, 2016 IL App (1st) 141008, ¶ 23.

¶ 81    This court has applied, in different cases, both a *de novo* standard and an abuse of discretion standard when reviewing a prosecutor's closing arguments. *People v. McNeal*, 2019 IL App (1st) 180015, ¶ 44; *People v. Johnson*, 2015 IL App (1st) 123249, ¶ 39 ("[t]his court has noted confusion regarding the appropriate standard of review regarding alleged errors occurring during closing arguments"); see also *People v. Boston*, 2018 IL App (1st) 140369, ¶ 82; *People v. Johnson*, 385 Ill. App. 3d 585, 603 (2008) ("Since *Wheeler*, appellate courts have been divided regarding the appropriate standard of review."). An abuse of discretion occurs when

the trial court's decision is arbitrary, fanciful, or unreasonable, or where no reasonable person would take the position adopted by the trial court. See *McNeal*, 2019 IL App (1st) 180015, ¶ 28. As noted, *de novo* consideration means that the reviewing court performs the same analysis that a trial judge would perform. See *McNeal*, 2019 IL App (1st) 180015, ¶ 29. In the case at bar, we need not resolve this dispute, because the outcome would be the same under either standard of review.

¶ 82    During its opening, the State referred to defendant as a "child sexual predator" three times. Specifically, at the beginning of its opening, the prosecutor stated:

"Ladies and gentlemen, meet the child sexual predator in this case, the person who violated [D.W.] when she was eight years old. The person who raped [D.W.] when she was nine years old. The person who raped [D.W.] when she was ten years old. The person who raped [D.W.] when she was 11 years old and 12 years old. A child sexual predator.

And in just a [few] minutes, ladies and gentlemen of the Jury, you're going to meet [D.W.] She's going to take several steps, brave steps to get up here and testify before you ladies and gentlemen and tell you about the worst thing that can happen to a little girl in her childhood, when her innocence is stripped by a child sexual predator. Someone she knew, someone she trusted, perhaps even loved, it was the father of her new baby brother. Her mother's new boyfriend."

¶ 83    Defendant contends that calling him a "child sexual predator" improperly implied that he was a convicted sex offender and "stacked the deck" against him. The purpose of an opening statement is to apprise the jury of what each party expects the evidence to prove. *People v. Kliner*, 185 Ill. 2d 81, 127 (1998). An opening statement may include a discussion of the

expected evidence and reasonable inferences from the evidence, and no statement may be made in opening that counsel does not intend to prove or cannot prove. *Kliner*, 185 Ill. 2d at 127. Reversible error occurs only where the prosecutor's opening comments are attributable to deliberate misconduct of the prosecutor and result in substantial prejudice to the defendant. *Kliner*, 185 Ill. 2d at 127.

¶ 84    In the case at bar, from the context of the comments, the prosecutor was making a reference to what the State intended to prove—that defendant was guilty of predatory criminal sexual assault of a child. This is apparent from the fact that the prosecutor specifically used the references when discussing what had happened to D.W. and not as a way to describe defendant generally. While defendant claims that the comment suggested that he had already been convicted, we see nothing in the prosecutor's comment that would lead to such an inference.

¶ 85    Moreover, even if the State's comments during opening were improper, such error would not have resulted in substantial prejudice to defendant. There were a total of three references, all located closely together at the beginning of the State's opening, after which the prosecutor did not make any problematic comments. The trial court also instructed the jury that opening statements were not evidence, directly before the State began its opening. See *People v. Peeples*, 155 Ill. 2d 422, 482 (1993) (finding that, while it disapproved of the prosecutor's reference to the defendant as a " 'human predator' " during opening, the jury was at least twice instructed that opening statements were not evidence, curing any error resulting from the remark). We thus cannot find that this handful of references substantially prejudiced defendant.

¶ 86    Next, defendant challenges two sets of comments contained in the State's rebuttal at the end of trial. In its closing argument, the defense had focused on the unlikelihood that defendant would be able to engage in inappropriate conduct, given the large number of people living in

32

the same apartment, and given that the girls shared a bedroom. The defense argued that, "the fact that there were so many people living in those houses is circumstantial evidence that this did not happen."

¶ 87    In its rebuttal, the State addressed the defense's argument:

"These are secretive crimes. He wouldn't really be a good rapist. He wouldn't be able to get away with raping [D.W.] for as many years as he did if he wasn't good at it. And that's what he did.

And so for the Defense to get up here and say that *** even if it were true, that at times there were so many people sleeping in the house. And that's reasonable to think. The girls said yeah, people came over. We had visitors. Sometimes they stay for weeks at a time. Sure, it was reasonable to think, but does that mean that people don't get raped and crimes don't happen in places such as dorm rooms, fraternity homes.

What about Hurricane Katrina when all those people were in the Super Dome? The number of sexual predators walking around there and people reported it. They were on cots in the Super Dome. What about the USA gymnastics doctor where there is girls lined up ready to get their exam and there is a girl in there? These crimes happen all the time. They are secretive crimes. They happen in rooms where there are no witnesses. He controls the crime. He is the criminal."

¶ 88    Defendant claims that the State's references to Hurricane Katrina and the gymnastics team were intended to inflame the passions and sympathies of the jurors. However, examining the entirety of the closing arguments, it is apparent that the State was responding to the defense's argument that there were too many people around for defendant to be able to engage in the conduct of which he was accused. "A reference to a well-known case in closing argument is

33

not improper if the comments do not suggest a personal similarity between the defendant and another criminal or inflame the jury." *People v. Weatherspoon*, 265 Ill. App. 3d 386, 395 (1994). In the case at bar, the State's examples did not suggest a personal similarity between the defendant and another criminal. Instead, they were only an attempt to persuade the jury not to discredit D.W.'s testimony merely because there were other people around. See *Weatherspoon*, 265 Ill. App. 3d at 395 (finding no error where "the prosecutor's statements focused on the victim rather than defendant in attempting to persuade the jury not to discredit her testimony merely because no person responded to her screams"). Moreover, even if they were improper, they were brief and the State did not dwell on them, so we cannot find that defendant was prejudiced by them.

¶ 89    Finally, the State argued that "in this case there could only be one truth. This isn't like a car accident and was the light yellow or red and were they halfway through. This is did it happen or didn't it happen. There is only one person telling the truth here." The State argued that the girls had no reason to lie about what happened to them, and noted that the standard was "beyond a reasonable doubt":

> "And is it reasonable to believe that [D.W.] when she was 8 years old made up this lie when she went to Iowa? Is it reasonable to believe that she persisted with this lie months later when she came back and there was an investigation into her allegations?
>
> Is it reasonable to believe that almost 11 years later, now that she is 19 years old, that she came into court because she has some axe to grind, that there is no evidence of, and told you ladies and gentlemen of the jury I was raped repeatedly as a child? Is it reasonable to believe that? Because if it is, she is an evil, sinister monster to be persistent to say these things, these terrible, horrible crimes against humanity. Is that

34

really who she is? *** Ladies and gentlemen, can you take your life experiences and think that she is some evil, sinister, horrible, despicable person? That's just not the evidence in this case, ladies and gentlemen."

¶ 90    Defendant claims that these comments were an attempt to "shame" the jurors into returning a guilty verdict by framing the case as a referendum on D.W.'s character. We do not find this argument persuasive. A prosecutor's closing argument may reflect upon witness credibility if it is based on facts in the record or inferences fairly drawn from those facts. *People v. Shum*, 117 Ill. 2d 317, 348 (1987). This includes comments about a witness' lack of motive to lie. *Shum*, 117 Ill. 2d at 349; see also *People v. Jennings*, 142 Ill. App. 3d 1014, 1024 (1986) (finding no error when "it is clear that the prosecutor was merely commenting on the credibility of the victim when noting that she had no motive to lie or fabricate her testimony"). The prosecutor's remarks here were merely commenting on D.W.'s lack of motive to lie, and we cannot find that they were improper.

¶ 91    As noted, the first step in a plain-error analysis is determining whether there was an error at trial and whether this error was clear or obvious. *Sebby*, 2017 IL 119445, ¶ 49. In the case at bar, we can find no error and, therefore, cannot find that defendant is entitled to reversal under the plain-error doctrine; even if we found error, it would not rise to the level of plain error because the evidence was overwhelming that defendant committed the act complained of.

¶ 92                                        CONCLUSION

¶ 93    For the reasons set forth above, the trial court's judgment is affirmed in both cases. First, the indictments in both cases were not unreasonably broad. Second, any error in cross-examining defendant did not rise to the level of plain error. Third, the aunt's reference to

35

defendant as a "predator" in T.W.'s case did not constitute reversible error. Fourth, the prosecutor's comments during D.W.'s case were not improper.

¶ 94          Affirmed.