2025 IL App (1st) 221884-U

SIXTH DIVISION
April 18, 2025

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of |
| Plaintiff-Appellee, | ) ) | Cook County |
| v. | ) ) ) | Nos. 12 CR 17054 12 CR 17053 |
| | ) ) | |
| WILLIE MORRISON, | ) ) | Honorable Alfredo Maldonado, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

PRESIDING JUSTICE TAILOR delivered the judgment of the court.
Justices Hyman and Gamrath concurred in the judgment.

**ORDER**

¶ 1    *Held*:    Summary dismissal of petitioner's postconviction petition is affirmed where petitioner waived his claim that he was denied his constitutional right to a speedy trial, failed to state the gist of a constitutional claim for ineffective assistance of appellate counsel, and failed to adequately support his ineffective assistance of trial counsel claim.

¶ 2    Petitioner, Willie Morrison, appeals from the summary dismissal of his *pro se*

postconviction petition. On appeal, he argues that he stated the gist of a constitutional claim that: (1) he was denied his right to a speedy trial; (2) appellate counsel was ineffective for failing to argue that he was denied his right to a speedy trial on direct appeal; and (3) trial counsel was ineffective for failing to investigate and procure a witness. For the following reasons, we affirm the judgment of the circuit court.

¶ 3                                      BACKGROUND

¶ 4      The following facts are taken from our order affirming Morrison's conviction on direct appeal. *People v. Morrison*, 2020 IL App (1st) 172626-U.

¶ 5      Morrison was originally charged with six counts of predatory criminal sexual assault of a child and three counts of aggravated criminal sexual abuse in case No. 12 CR 17053, for his alleged conduct with respect to three sisters T.W., D.W., and A.W., all of whom were under the age of 13 at the time that the alleged conduct occurred. The cases were later separated, and the ultimate charges Morrison faced in each case were as follows. In case No. 12 CR 17053, Morrison was charged with three counts of predatory criminal sexual assault of a child based on contact between Morrison's penis and D.W.'s vagina and anus, and between Morrison's mouth and D.W.'s vagina, all occurring when D.W. was under 13 years of age. The contact was alleged to have occurred "on or about December 19, 2006[,] and continuing on through December 18, 2011." In case No. 12 CR 17054, Morrison was charged with two counts of predatory criminal sexual assault of a child based on contact between Morrison's penis and T.W.'s vagina and anus, and two counts of aggravated criminal sexual abuse based on Morrison's touching of T.W.'s buttocks and breasts for the purpose of sexual gratification, all occurring when T.W. was under 13 years of age. The contact was alleged to have occurred "on or about March 22, 2005, and continuing on through July 02, 2011." Finally, in case No. 12 CR 17055, Morrison was charged

with one count of predatory criminal sexual assault of a child based on contact between Morrison's penis and A.W.'s anus, and one count of aggravated criminal sexual abuse based on Morrison's touching of A.W.'s buttocks for the purpose of sexual gratification, all occurring when A.W. was under 13 years old. Case no. 12 CR 17055 was later dismissed and was not at issue on direct appeal and is not at issue in this appeal.

¶ 6      The State elected to proceed first on T.W.'s case, No. 12 CR 17054. On February 10, 2014, the State filed a motion *in limine* seeking to introduce certain statements made by T.W. under section 115-10 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-10 (West 2012)). The State's motion in limine was granted after a hearing, and Morrison did not challenge the admission of this evidence on appeal.

¶ 7      On October 8, 2014, the State filed a motion *in limine* seeking to introduce evidence of other crimes in T.W.'s case under section 115-7.3 of the Code (725 ILCS 5/115-7.3 (West 2012)). Specifically, the State sought to introduce evidence of (1) acts allegedly committed by Morrison against T.W.'s sisters, D.W. and A.W.; (2) a "proposition" Morrison allegedly made to one of T.W.'s relatives; and (3) a prior sexual assault Morrison allegedly committed against his biological daughter in 2001, for which he was acquitted after a jury trial. The State also filed a similar motion in D.W.'s case on the same day. After a hearing, the trial court denied the State's motion *in limine* with respect to using the evidence to show Morrison's propensity to commit such acts but permitted the evidence of Morrison propositioning the relative to the extent that it explained the timing of T.W.'s outcry. The State filed a motion to reconsider and on February 27, 2017, the court granted the State's motion to reconsider in part, permitting the State to introduce evidence of Morrison's alleged conduct toward T.W.'s sisters. Morrison did not challenge the court's order or the use of evidence of other crimes on direct appeal.

3

¶ 8    While Morrison was separately tried and convicted for his conduct with respect to T.W. and D.W., most of the same witnesses testified at each trial, and Morrison did not raise any issues with the sufficiency of the evidence at either trial. Consequently, on direct appeal, we discussed the evidence presented at both trials together.

¶ 9    As noted, the State elected to proceed to trial first in T.W.'s case (case No. 12 CR 17054). A mistrial was declared due to a hung jury, and the State immediately retried Morrison, with the second trial beginning on July 21, 2017. In D.W.'s case (case No. 12 CR 17053), trial began on January 26, 2018.

¶ 10    T.W., who was 17 at the time of the trial in her case, testified that she had two sisters, D.W. and A.W., and a brother, K.M., who was Morrison's son. T.W. testified that she was currently living with her grandmother, but that she previously lived with her mother and Morrison, who she referred to as her stepfather. T.W. testified that the first time Morrison engaged in inappropriate conduct, she was five years old. She was in her grandmother's bedroom, watching cartoons on television and eating a grilled cheese sandwich while her mother slept in another room, when Morrison entered the bedroom, removed her clothing, applied Vaseline to her vagina, and placed his penis inside her vagina. After Morrison was finished, he wiped her off, put her clothes back on, and left the room. T.W. did not tell anyone what had occurred because she did not understand what had happened.

¶ 11    T.W. testified that another time, she was excited about taking photos for her kindergarten graduation, but became upset when she discovered that her mother could not afford to purchase the photos. Morrison told her that he would pay for the photos if she would "do something," which T.W. did not understand. Morrison again removed her clothing, applied Vaseline to her vagina, and placed his penis inside her vagina. Morrison also gave her the money to purchase the

photos.

¶ 12    T.W. testified that Morrison continued with his conduct from the time she was 5 until she was 11 or 12 and that he typically touched her at night. T.W. testified that she shared a room with her sisters and, sometimes a cousin, and would sleep on the bed or on the floor. Morrison would enter the room quietly and wake her with a whisper or a tap, and then remove her clothing. T.W. testified that, during these times, Morrison's penis would touch her vagina and sometimes his hands would touch her breasts or buttocks.

¶ 13    T.W. testified that she lived in five or six different residences with her mother and Morrison, and that Morrison engaged in the same conduct in all of them. The frequency of Morrison's conduct decreased at the last residence, which was where they were living when she was 11 or 12. T.W. testified that, in all of the residences she lived in, she shared a room with her sisters and sometimes a cousin. She never observed Morrison engaging in any sexual conduct with her sisters.

¶ 14    T.W. testified that Morrison's sexual conduct also occurred outside the home, such as in the van that he drove. T.W. testified that Morrison's van had three rows of seats, with blinds and tinted windows that made it difficult to see inside, and that he touched her five to ten times inside the van. T.W. recalled one instance, when she was eight or nine, where she entered the van because Morrison told her that they were going to the store to buy chips. After they were finished at the store, they returned to the van, which was parked on a side street, and Morrison instructed her to go to the last row of the van, where he removed her clothing, applied Vaseline to her vagina, and placed his penis inside her vagina. A police vehicle drove by, so Morrison became scared and moved to the driver's seat but returned to the back when the police were gone. T.W. recalled this instance because she "would have thought the police would have caught on and

would have been [suspicious] about the van," but they did not stop.

¶ 15    T.W. testified that, on approximately five occasions, Morrison took her to his workplace at H&R Block. When she was 9 or 10, Morrison took her to his workplace and, after he was finished with his work, T.W., Morrison, and Morrison's friend left to obtain food and then returned to the office. T.W. sat in the back room eating and, when she went into the bathroom, Morrison followed her. T.W. could not recall if the friend was still at the office. Morrison grabbed her from behind by the waist, pushed her towards the sink, removed her clothing, and inserted his penis into her vagina.

¶ 16    T.W. testified that, when she was 10 or 11, her grandfather died. She was at home with her sister, her cousin, and Morrison when Morrison asked for her phone. T.W. went to retrieve it, and Morrison pulled her into his bedroom, where he pushed her onto the bed, removed her clothing, and placed his penis into her vagina. T.W. testified that she was able to remember this day specifically "[b]ecause it was the day I lost my grandfather."

¶ 17    T.W. testified that Morrison's penis also touched her buttocks when she was 10 or 11. She was at the park with her siblings and had returned to the van for something. Morrison followed her to the van, and instructed her to move to the backseat, against a window ledge. Morrison then told T.W. that she was "a big girl now" and inserted his penis into her anus. T.W. testified that he repeated this conduct on other occasions, but "not that many."

¶ 18    T.W. testified that, when she was 10, she was on a chair in her bedroom while her sister and cousin were sleeping in the bed. Morrison entered the room, pulled her to the floor, removed her clothing, and placed his penis into her vagina. T.W.'s sister began to move as though she was waking up, and Morrison placed his hands around T.W.'s neck and said, "if you say anything I will choke you to death." T.W. testified that this was the only time he threatened her.

¶ 19    T.W. testified that, during the years when Morrison was touching her, she did not tell anyone because she was scared. However, in June 2012, she and her sisters took a summer trip to Iowa to visit her aunt and her cousins. One day, someone called her aunt, which led to her questioning T.W. and her sisters about Morrison. T.W. did not say anything because she was still scared. Later, when T.W. was sleeping, her aunt woke her and again questioned her, "so it just burst out." T.W. was crying and felt a sense of relief "because it was like something that I was holding in for a long time." A few days later, her aunt took them back to Chicago, where she called the police. After she called the police, she took them to the Children's Advocacy Center, where T.W. spoke to a woman. T.W. testified that she was truthful with the woman "[b]ecause I wanted her to know the truth and to do something about it." After T.W. returned to Chicago, she and her siblings never lived with Morrison or her mother again, and her grandmother became their legal guardian.

¶ 20    D.W., who was 18 years old at the time of the trial in T.W.'s case and 19 at the time of her own, testified that she was the oldest of her siblings. D.W. testified that she was eight years old the first time that Morrison touched her inappropriately. She was sleeping in her bedroom, when Morrison came into the room, pulled her pants down, and inserted his penis into her vagina. D.W. was "shocked." On another occasion, Morrison entered her room one night while she and a sibling were sleeping and inserted his penis into her buttocks and into her vagina. Once, Morrison tried to choke her to keep her quiet. D.W. testified that Morrison once also touched his lips to her vagina when she was 10.

¶ 21    D.W. testified that they lived in several residences with her mother and Morrison, and that Morrison touched her inappropriately at each residence, except for the last one. D.W. testified that she shared a room with her siblings at each residence. She never observed Morrison

abusing or threatening any of her sisters. D.W. testified that in June 2012, she and her sisters traveled to Iowa to spend the summer with their aunt. While she was in Iowa, she told her aunt what Morrison had done to her.

¶ 22    A.W., who was 15 years old at the time of the trial in T.W.'s case and 16 at the time of D.W.'s, testified that she lived with her grandmother and her siblings, and that she was the youngest of the sisters. A.W. testified that Morrison first touched her "in a bad way" when she was five years old, when he inserted his penis into her buttocks while she was in her bedroom sleeping. A.W. testified that Morrison touched her inappropriately "more than ten times."

¶ 23    The victims' aunt testified that she lived in Des Moines, Iowa, and previously lived in Chicago with her mother and sister. Her sister had four children: A.W., T.W., D.W., and K.M.; K.M. was Morrison's son. When the aunt lived in Chicago, Morrison was also living at the same residence, and she thought of him as "a big brother that you never had."

¶ 24    In the summer of 2012, she traveled to Chicago to pick up A.W., T.W., and D.W., who were planning on spending the summer in Iowa with her daughter, who was of like age. On July 7, 2012, she received a text message from one of her sisters, which led her to speak to the girls. She first spoke to D.W.; then she spoke to T.W. and A.W. at the same time. T.W. denied that Morrison had ever touched her inappropriately, but the aunt "[could] tell that she wasn't telling the truth" because of her demeanor. On July 10, the aunt's daughter approached her and told her that T.W. wanted to speak with her. The aunt found T.W. and A.W. in her daughter's room, crying. She asked what was wrong, and T.W. told her that Morrison had been touching T.W. on her "private parts," gesturing to her buttocks and her vagina. She asked T.W. where this would happen, and T.W. told her that Morrison would take her to secluded areas, such as a Pizza Hut or a closed car wash. T.W. told her that Morrison would trick her by telling her that they were

going to her grandmother's house or to the store and then pull over where he felt safe. T.W. told her that she had not said anything earlier because she was scared and that Morrison had threatened her.

¶ 25    After the conversation, the aunt began gathering money to pay for a trip back to Chicago. She had also contacted the Des Moines police department but was told that they could not do anything. They returned to Chicago on July 23, 2012, and the aunt took the girls directly to the police department. She was told to wait until the next day, so they stayed overnight at the home of her godsister. The next day, they contacted the police from the home of a relative and she took the girls to Comer Children's Hospital. A few days later, she brought them to the Children's Advocacy Center to be interviewed. The aunt eventually returned to Iowa and the girls stayed with their grandmother.

¶ 26    Sergeant Timothy Fenton testified that he was a patrol officer on July 23, 2012, and received an assignment concerning a criminal sexual assault. He and his partner met with two of the victims' aunts. However, due to the victims' ages, they did not interview them directly. After speaking with the two adult aunts, Fenton completed a police report and called the Department of Children and Family Services (DCFS), as it was a crime involving children, as well as a special investigations unit that specifically handled child sex crimes. The special investigations unit was located at the Children's Advocacy Center, which also contained offices for DCFS workers, health care professionals, and forensic interviewers. Fenton testified that the Children's Advocacy Center was "just basically a setting where everybody is there to take care of the kids." DCFS advised Fenton to take the girls to the emergency room of a hospital, and Fenton brought them to Comer Children's Hospital.

¶ 27    Dr. Norell Rosado testified that he is a pediatrician specializing in child abuse and was working at the Children's Advocacy Center when the girls were brought in. He testified as an expert in both pediatrics and in child abuse pediatrics with no objection. Rosado testified that, during his career, he had assessed "probably over 2,000 cases" for possible sexual abuse and had given opinions of sexual abuse in approximately 10% of the cases.

¶ 28    Rosado testified that he was working at the Children's Advocacy Center on August 7, 2012, and examined T.W., D.W., and A.W. T.W. was 12 years old at the time, D.W. was 13, and A.W. was 10. The three children had been examined at the emergency room of a hospital, and had completed forensic interviews, so Rosado reviewed that information prior to his examination. Rosado did not feel the need to interview the girls further, but did perform another exam on each of them because he felt that the original exams had not been sufficient.

¶ 29    With respect to T.W., Rosado testified that T.W. had a very thin hymen, which became thinner "between the 6:00 and the 8:00 *** position." Rosado explained that this finding "is concerning for vaginal penetrating trauma." Rosado further explained that the area between "3:00" and "9:00" was the area that became most traumatized during sexual intercourse, which would cause thinning of the hymen in that area. Rosado also performed an exam of her anal cavity, which was normal. Rosado testified that this was not surprising, because while it was rare to observe vaginal findings of abuse, it was even more rare to observe anal findings, given the function of the organ and its ability to permit the passage of stool. Rosado opined that, to a reasonable degree of medical certainty, T.W. was sexually abused based on the medical findings and her disclosure of vaginal and anal penetration. Rosado further testified that T.W.'s forensic interview was consistent with his findings and that he found it significant that she was able to recall details of what happened to her, such as locations and times, and the fact that the incidents

10

were sometimes correlated with significant events, such as her grandfather's death. Rosado also found it significant that T.W. mentioned the use of lubrication, which was inappropriate knowledge for a child her age.

¶ 30    With respect to D.W., Rosado testified that she also had findings that were concerning for vaginal penetrating trauma. Rosado testified that there were certain positions in the hymen in which some women naturally have "notches" or anatomical variances, but there were other positions in which it would not be normal to observe such notches. D.W. had two deep notches in the latter positions. As with T.W., D.W.'s anal exam was normal. Rosado opined that, to a reasonable degree of medical certainty, D.W. was sexually abused based on the medical findings and her disclosure of vaginal and anal penetration.

¶ 31    Finally, with respect to A.W., Rosado noted that she had not provided any history of penis-to-vagina penetration but only penis-to-anus penetration. Her genital exam was normal, which Rosado found unsurprising.

¶ 32    Morrison took the stand on his own behalf and testified that he met the victims' mother in 2004, and they moved in together in 2005. Morrison testified that he loved T.W., D.W., and A.W., referred to them as his children, and considered himself to be a father figure to them. Morrison denied ever sexually assaulting any of them. Morrison recalled T.W.'s kindergarten photos and that she wanted to purchase them but testified that he thought that T.W.'s grandparents purchased the photos. Morrison testified that he worked at H&R Block and that his workplace had a desk and a bathroom but denied that he was ever alone in the office with minors. Morrison testified that there were occasions when he took one of the girls on errands alone, including to work. Morrison also testified that he owned a van that had a third-row seat.

¶ 33    On July 25, 2017, the jury in the second trial in T.W.'s case (case No. 12 CR 17054)

returned a guilty verdict on all four counts and the trial court entered judgment on the verdict. Morrison filed a motion for a new trial, which was denied, and Morrison was sentenced to 30 years for each of the predatory criminal sexual assault of a child charges, and 7 years for each of the aggravated criminal sexual abuse charges. The sentences for aggravated criminal sexual abuse were to be served concurrently, and the sentences for predatory criminal sexual assault of a child were to be served consecutively, for a total sentence of 67 years. On January 30, 2018, the jury in D.W.'s case (case No. 12 CR 17053) returned a guilty verdict on all three counts of predatory criminal sexual assault of a child, and the trial court entered judgment on the verdict. Morrison filed a motion for a new trial, which was denied, and Morrison was sentenced to natural life for each of the charges, to be served concurrently, but which were to be served consecutively to the sentence in T.W.'s case.

¶ 34    In his consolidated direct appeal, Morrison argued that the indictments alleged an unreasonably broad time frame, and that the ASA improperly had him comment on the veracity of the State's witnesses. *Morrison*, 2020 IL App (1st) 172626-U, ¶¶ 45-71. He also argued that in T.W.'s case the trial court erred in allowing the victims' aunt to refer to him "as a 'predator.' " *Id*. ¶¶ 45, 71-77. In D.W.'s case, Morrison argued that the prosecutor made improper comments in opening statements and closing arguments. *Id*. ¶¶ 45, 78-91.

¶ 35    On November 25, 2020, we affirmed Morrison's convictions, finding that: (1) the indictments were not unreasonably broad, (2) any error in cross-examining him did not rise to the level of plain error, (3) the victims' aunt's reference to him as a "predator" in T.W.'s case was not reversible error, and (4) the prosecutor's comments during opening and closing in D.W.'s case were not improper. *Id*. ¶ 1. We also rejected Morrison's alternative claim that his trial counsel was ineffective for failing to make and preserve his appellate arguments. *Id*. ¶¶ 56-59,

70, 77. On September 29, 2021, the Illinois Supreme Court denied Morrison leave to appeal. *People v. Morrison*, 2021 IL LEXIS 812.

¶ 36    On July 12, 2022, Morrison filed a *pro se* postconviction petition wherein he alleged *inter alia* that he was denied his right to a speedy trial where his trial was delayed "over 1400" days. He urged that the "inordinate delay of the first trial" was "caused by the fact that five (5) different attorneys were on his case through the proceedings." He also alleged that trial counsel had been ineffective in that he failed to obtain an expert to rebut Dr. Rosado's "opinion that the sisters had been sexually abused the most damaging evidence possible." Morrison also alleged his appellate counsel's ineffectiveness for not raising the meritorious claims asserted in his petition, which were "clearly available of record."

¶ 37    On October 3, 2022, the trial court summarily dismissed Morrison's petition. The court found that he waived his claim that his trial counsel was ineffective for failing to assert his speedy trial rights by failing to raise the issue on direct appeal. Notwithstanding its waiver, the court found the claim meritless and pointed out that "[m]any of the continuances were not objected to or were by agreement of both parties. Thus, petitioner cannot show how the continuances, which are properly attributed to him, violated his rights to a speedy trial." The court also ruled that Morrison's ineffective assistance of appellate counsel claim failed because the underlying claim was without merit.

¶ 38    Morrison now appeals the summary dismissal of his post-conviction petition.

¶ 39                                ANALYSIS

¶ 40    Morrison argues that the trial court erred in dismissing his *pro se* postconviction petition where he stated the gist of a meritorious claim that: 1) his constitutional right to a speedy trial was violated by a four-year, eight-month and three-day delay between his arrest and the

13

commencement of trial on any of the charges against him; 2) appellate counsel was ineffective for failing to raise the speedy trial claim on direct appeal; and 3) trial counsel was ineffective for failing to investigate and procure an expert witness to rebut Dr. Rosado's testimony that D.W. and T.W.'s genital exams verified that they had been vaginally penetrated.

¶ 41 The Illinois Postconviction Hearing Act (Act) provides a procedural mechanism through which a defendant may assert that his conviction or sentence resulted from a substantial denial of his constitutional rights. 725 ILCS 5/122-1 (West 2022). The Act provides a three-stage process for adjudication of a postconviction petition. *People v. Applewhite*, 2020 IL App (1st) 142330-B, ¶ 15. At the first stage, the postconviction court must assess the petition, taking the allegations as true, and determine if it is frivolous or patently without merit such that it fails to state the gist of a meritorious constitutional claim. *Id.*; *People v. Hodges*, 234 Ill. 2d 1, 10 (2009). A petition may be summarily dismissed as frivolous or patently without merit only if the petition has no arguable basis in either fact or law. *People v. Tate*, 2012 IL 112214, ¶ 9 ("the threshold for survival [is] low"). A petition lacks an arguable basis in fact or law when it "is based on an indisputably meritless legal theory or a fanciful factual allegation." *Hodges*, 234 Ill. 2d at 16. Fanciful factual allegations are those which are "fantastic or delusional" and an indisputably meritless legal theory is one that is "completely contradicted by the record." *Id.* at 16-17. Our review of a first-stage summary dismissal is *de novo*. *Tate*, 2012 IL 112214, ¶ 10.

¶ 42 Morrison argues that we should reverse the circuit court's summary dismissal of his *pro se* petition because he stated the arguable basis for a claim that he was denied his constitutional right to a speedy trial. He acknowledges that he did not raise this claim on direct appeal but argues that this claim is not forfeited because such claims require factual determinations using the factors announced in *Barker v. Wingo*, 407 U.S. 514 (1972), which the trial court did not

make before his appeal.

¶ 43    In *Barker*, the defendant appealed from the denial of his *habeas corpus* petition wherein

he argued that his constitutional right to a speedy trial was violated.  In rejecting the defendant's

argument, the Supreme Court found that "any inquiry into a speedy trial claim necessitates a

functional analysis of the right in the particular context of the case." *Id*. at 532. This requires

courts to balance "the conduct of both the prosecutor and the defendant *** on an *ad hoc* basis."

The Court instructed that the factors to be considered in this balancing test are the "[l]ength of

delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the

defendant." *Id*.

¶ 44    As the State argues, *Barker* does not require that the trial court conduct an independent

analysis of Morrison's speedy trial claim in this case, particularly where Morrsion did not assert

his speedy trial rights in the circuit court. Morrison could have asserted his right to a speedy trial

in the circuit court. He did not. He also could have raised this issue on direct appeal. He did not.

"[I]ssues that were raised and decided on direct appeal are barred from consideration by the

doctrine of *res judicata*; issues that could have been raised, but were not, are considered

waived." *People v. Pitsonbarger*, 205 Ill. 2d 444, 456 (2002)). Applying the rule of forfeiture,

we conclude that the circuit court did not err in concluding that this claim was frivolous and

patently without merit. *People v. Blair*, 215 Ill. 2d 225, 442 (2005).

¶ 45    Morrison argues in the alternative that even if he forfeited the speedy trial argument by

not raising it on direct appeal, appellate counsel was ineffective for failing to raise it on direct

appeal. To succeed on a claim of ineffective assistance of appellate counsel a defendant must

establish: (1) the failure to raise an issue was objectively unreasonable; and (2) but for the failure

to raise the issue, the trial court's ruling would have been reversed. *Strickland v. Washington*,

466 U.S. 668 (1984); *People v. Flores*, 153 Ill. 2d 264, 277 (1992). "At the first stage of postconviction proceedings under the Act, a petition alleging ineffective assistance may not be summarily dismissed if (i) it is arguable that counsel's performance fell below an objective standard of reasonableness and (ii) it is arguable that the defendant was prejudiced." *Tate*, 2012 IL 112214, ¶19 (quoting *Hodges*, 234 Ill. 2d at 17.).

¶ 46     Appellate counsel is not required to raise every conceivable issue on appeal, and it is not incompetence of counsel to refrain from raising issues which, in his or her judgment, are without merit, unless counsel's appraisal of the merits is patently wrong. *People v. Simms*, 192 Ill. 2d 348, 362  (2000). "Thus, the inquiry as to prejudice requires that the reviewing court examine the merits of the underlying issue [citation] for a defendant does not suffer prejudice from appellate counsel's failure to raise a nonmeritorious claim on appeal." *Id*. at 362.

¶ 47     Turning to the merits, a defendant has a right to a speedy trial under the United States and Illinois Constitutions (U.S. Const., amends. VI, XIV; Ill. Const.1970, art. I, § 8), as well as under Illinois law (725 ILCS 5/103-5 (West 2022)). However, "the statutory right to a speedy trial is not the precise equivalent of the constitutional right." *People v. Staten*, 159 Ill.2d 419, 426 (1994). To establish a violation of the statutory right to a speedy trial, a defendant must show that he "has not been tried within the period set by statute and that defendant  has not caused or contributed to the delays." *Id*. In contrast, a constitutional analysis requires consideration of: (1) the length of the delay in trial; (2) the reasons for the delay; (3) the defendant's assertion of the speedy-trial right; and (4) prejudice to the defendant caused by such delay. *Barker*, 407 U.S. at 532; *People v. Crane,* 195 Ill. 2d 42, 52 (2001). "All four factors are closely related and no one factor is necessary or sufficient to a finding that the right to a speedy trial has been violated." *Id*. Whether a defendant's constitutional right to a speedy trial has been violated should be

determined based on the totality of the circumstances. *Id*. at 48.

¶ 48     Here, Morrison complains of a more than 4-year delay which is presumptively prejudicial. *Id*. at 52 (courts have recognized a delay approaching one year to be presumptively prejudicial). Presumptively prejudicial delays require a full "Barker inquiry." *People v. Kaczmarek*, 207 Ill. 2d 288, (2003). However, a finding of "presumptive prejudice" does not mean that the delay will be found to have actually prejudiced the defendant. Rather, it merely triggers the remainder of the speedy-trial inquiry. *Crane*, 195 Ill. 2d at 53.

¶ 49     We must then consider the second factor, the reason for the delay. The State bears the burden of providing justification for any delay which has occurred. *Id*. Reasons which may be offered to explain a delay are assigned different weight. *Id*. (citing *Barker*, 407 U.S. at 531). For example, evidence that the State intentionally delayed prosecution to gain some tactical advantage will weigh very heavily against the State, while more neutral reasons, though still charged against the State, will be weighed less heavily. *Crane*, 195 Ill. 2d at 53. Other reasons for delay, such as the unavailability or inability to locate a competent witness, or a judge's illness, are generally held to be valid explanations, justifying a reasonable period of delay. *Id*. at 53-54.

¶ 50     Here, Morrison argues that the State delayed his trial in bad faith, However, Morrison fails to specify how or when the State delayed his trial in bad faith. We therefore decline to consider this argument. Nevertheless, he argues that even if the State did not act in bad faith, significant portions of the delay in trial resulted from the State's negligence in completing discovery, obtaining pretrial rulings, and generally bringing him to trial. The record belies this claim. As the State correctly notes, Morrison's counsel sought or agreed to almost all of the continuances prior to his initial trial. One week before the trial was set to begin, Morrison

requested another delay, complaining that he did not have enough time to consider the State's latest plea offer. The court denied Morrison's request, informing him "this isn't a last second kind of thing," and that he had "ample time." Consequently, this second *Barker* factor weighs against Morrison where the record positively rebuts Morrison's claim.

¶ 51    The third factor we must consider is Morrison's assertion of his right to a speedy trial. Morrison admits that he never made a trial demand or asserted his constitutional right to a speedy trial. As the *Barker* court noted, "failure to assert the right [to a speedy trial] will make it difficult for a defendant to prove that he was denied a speedy trial." 407 U.S. at 532.

¶ 52    Morrison attempts to minimize his failure to assert his constitutional right to a speedy trial by arguing that it was the direct result of the "systemic breakdown in the public defender system" where "revolving-door representation" by repeatedly reassigned assistant public defenders led to "inconsistent" and "deficient" representation, unnecessary continuances and several attorneys doing "little to nothing" to actually advance his case toward trial. Morrison notes that there was no obvious reason this systemic breakdown occurred, but suggests it was because the Public Defender's office employs a yearly rotation policy for its attorneys, which resulted in the yearly reassignment of different attorneys to his case. Morrison argues, citing *Vermont v. Brillon*, 556 U.S. 81, 92 (2009), that when a delay in trial is the result of a "systemic breakdown in the public defender system" the delay could be charged to the State, rather than to the defendant.

¶ 53    Morrison did not raise this issue in his postconviction petition. A petitioner may not raise an issue for the first time on appeal from the denial of his postconviction petition. *People v. Jones*, 213 Ill. 2d 498, 507-08 (2004). Therefore, this issue is forfeited. *Pitsonbarger*, 205 Ill. 2d at 456. Furthermore, there is also no evidence in the record to suggest that an institutional

breakdown caused the repeated delays in this case. Without such evidence, as the Supreme Court found in *Brillon*, 556 U.S, at 92-94, there would be no reason to attribute the delays to the State. As such, we conclude that this third *Barker* factor weighs against Morrison.

¶ 54    Finally, the fourth factor to consider is the prejudice to Morrison caused by the delay. Morrison generally asserts that the delay was presumptively prejudicial because it resulted in the serious impairment of his liberty. In assessing prejudice to the accused, the court must consider the interests sought to be protected by the speedy-trial right: (1) the prevention of oppressive pretrial incarceration; (2) the minimization of the anxiety and concern of the accused; and (3) the limitation of the possibility that the defense will be impaired. *Barker*, 407 U.S. at 532; *People v. O'Quinn*, 339 Ill. App. 3d 347, 356 (2003). "We note that [anxiety and concern] is present to some extent in every case and absent some unusual showing, this inconvenience alone is of slight import." See *Kaczmerak*, 207 Ill. 2d 288, 300 (2003)

¶ 55    Morrison makes no specific argument relating to the actual assessment of prejudice other than to say that "the four-year and eight-month delay carried presumptive prejudice" to his defense. He then points to the fact that two of the State's witnesses, Lauren Glazer and Detective Downes, had left the State and retired by the time of his first trial. Morrison has failed to offer any particularized showing that his defense was impaired in any way by the delay. He does not claim that any of his witnesses died or otherwise became unavailable based on the delay. *Barker*, 407 U.S. at 534. Accordingly, we find that the fourth factor does not support Morrison's claim of a violation of his right to a speedy trial.

¶ 56    Based on the totality of the circumstances, we conclude that the delay Morrison complains of did not result in a violation of his constitutional rights. Accordingly, we find that the claim lacks arguable legal merit and that the trial judge did not err in concluding that

Morrison failed to establish the gist of a claim for ineffective assistance of appellate counsel.

¶ 57     Morrison's final argument on appeal is that his petition stated an arguable basis for a claim that trial counsel was ineffective for failing to investigate and procure an expert witness to rebut Dr. Rosado's testimony that D.W. and T.W.'s genital exams verified that they had been vaginally penetrated.

¶ 58     As previously discussed, at the first stage of postconviction proceedings under the Act, a petition alleging ineffective assistance may not be summarily dismissed if it is arguable that counsel's performance fell below an objective standard of reasonableness, and it is arguable that the defendant was prejudiced." *Hodges*, 234 Ill. 2d at 17. A defendant must satisfy both prongs, and the failure to satisfy either precludes an argument defendant received ineffective assistance of counsel. *People v. Wilborn*, 2011 IL App (1st) 092802, ¶ 76.

¶ 59     The Act requires that the petition "shall have attached thereto affidavits, records, or other evidence clearly supporting its allegations or shall state why the same are not attached." 725 ILCS 5/122-2 (West 2022). "[T]the purpose of section 122-2 is to establish that a petition's allegations are capable of 'objective or independent corroboration.' " *People v. Delton*, 227 Ill.2d 247, 254 (2008) (quoting *People v. Hall*, 217 Ill.2d 324, 333 (2005)). Our supreme court has long held that under section 122-2 " '[a] claim that trial counsel failed to investigate and call a witness must be supported by an affidavit from the proposed witness.' " *People v. Harris*, 224 Ill. 2d 115, 142 (2007) (quoting *People v. Enis*, 194 Ill. 2d 361, 380 (2000)). In the absence of such an affidavit, a reviewing court cannot determine whether the proposed witness could have provided testimony or information favorable to the defendant. *People v. Johnson*, 183 Ill. 2d 176, 192 (1998).

¶ 60     Here, Morrison has not identified an expert, nor has he attached an affidavit, record or

other corroborating evidence from any purported expert to refute Dr. Rosado's testimony. Therefore, there was no actual evidence favorable to Morrison on the subject, and summary dismissal was proper. See *People v. Delton*, 227 Ill. 2d 247, 255, (2008) (stating failure to support a postconviction petition with some factual documentation or some explanation of its absence justifies summary dismissal); *People v. Collins*, 202 Ill. 2d 59, 66 (2002) (same).

¶ 61    Citing *People v. Montgomery*, 327 Ill. App. 3d 180 (2001), Morrison argues that he was not required to provide an affidavit or any additional evidence to support his claim of ineffective assistance of counsel for failure to investigate and procure a witness to rebut Dr. Rosado's testimony. In *Montgomery*, the defense theory was that the victim died from a seizure, not from strangulation. *Id.* At trial, the State had no physical evidence linking the defendant to the crime other than his statement to the police. The only evidence offered by the defense was by way of stipulation that the victim had suffered from a seizure disorder for 20 years. The defendant was convicted of murder, aggravated criminal sexual assault, criminal sexual assault and unlawful restraint. *Id.*

¶ 62    The defendant filed a *pro se* postconviction petition arguing that trial counsel was ineffective for failing to introduce medical evidence to support the defense theory that the victim died from a seizure. The petition was dismissed at the first stage. We reversed the first-stage dismissal of the defendant's postconviction petition where counsel was arguably ineffective for failing to introduce medical evidence that the victim died from a seizure and not strangulation. We found that counsel failed to adequately investigate whether there was medical evidence that could have raised a reasonable doubt as to the victim's cause of death. *Id.*

¶ 63    Morrison argues that like the defendant in *Montgomery*, he was not required to provide an affidavit or other additional evidence in support of his claim because the corroboration

requirement of section 122-2 it is satisfied by material present in the direct appeal record. Specifically, Morrison argues Dr. Rosado's own testimony at trial indicated that his opinion was opposed to at least one other medical expert's conclusion, as that was why he had performed his own genital examination in the first place. He urges that Rosado's own admission that at least one medical professional who examined D.W. and T.W. came to opposite conclusions is sufficient to establish that such contrary medical opinions existed and would be helpful to the defense, thereby obviated the extrinsic corroboration required by section 122-2.

¶ 64    The record in this case belies Morrison's claim that Dr. Rosado performed his own genital examination because "his opinion was opposed to at least one other medial expert's conclusion." On direct examination, Dr. Rosado testified that although he had the medical records from the girls' visit to the University of Chicago emergency department on July 23, and the report from a forensic interview from the Children's Advocacy Center, he performed another exam because:

> "Not a lot of pediatricians, actually very few pediatricians know how to do a proper medical exam in children that have been -- or there's been allegations of sexual abuse. And furthermore, there's also the documentation part of it, that we need to learn how to document those exams correctly.
>
> So we review those medical records and if that documentation and the exam was done appropriately, then we don't need to do another medical exam, we don't want to put children through that again. Unfortunately, sometimes we see that the documentation and/or the exam was not done appropriately, so we have to do another medical examination on these children.
>
> Q. What was not done appropriately when you reviewed the records from University

of Chicago in [T.W.'s] medical exam two weeks prior?

A. When I reviewed the medical exam, one of the important parts of the exam is obviously the genital urinary exam, the exam of their genitals. And on [T.W.'s] exam, it said that they had not identified the hymen, which was concerning.

Q. Tell us why it was concerning that they had not identified a hymen on 12-year old [T.W.]?

A. Because every single woman that is born has a hymen. The only times that we may not see a hymen is in women who have major genital urinary anatomic abnormalities. So any genetic conditions where the genitals are malformed, and in those cases we might not see a hymen. Other than that, every single woman has a hymen.

Q. So whether it's a female who's 5-years old, 12-years old, or 72-years old, every woman, unless they have a genetic abnormality, has a hymen, correct?

A. Correct.

Q. How about in her sister [D.W.'s] medical records, what did you notice that was unusual in those medical records?

A. In those medical records there was not a mention of the hymen, there was nothing that said anything about the hymen.

Q. After reviewing those records, you were concerned there was not a proper medical exam done, correct?

A. Correct.

Q. And so what did you take steps to do at that point, Doctor?

A. So I decided to do a medical exam on these children, and when we do medical exam, we do medical exam like everybody should do, from head to toe, we examine

every single part of their bodies."

Clearly, Dr. Rosado performed another examination of the victims because the first examination done in the emergency room was not thorough enough. The record in no way demonstrates that there was another expert in this case that could have been called by the defense that came to a different conclusion as to whether the victims were sexually abused. Hence, unlike *Montgomery,* there is no evidence in the record here to support a conclusion that there was another explanation for the findings made by Dr. Rosado. Therefore, Morrison's failure to provide corroboration for his claim under section 122-2 (725 ILCS 5/122-2 (West 2022)), is fatal to his claim of ineffective assistance of trial counsel.

¶ 65                                   CONCLUSION

¶ 66     In light of the foregoing, we affirm the circuit court's summary dismissal of Morrison's postconviction petition.

¶ 67     Affirmed.